**\*NOT FOR PUBLICATION\***

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| WANDA I. RIVERA,<br><br>    Plaintiff,<br><br>v.<br><br>ANDREW SAUL,<br>Commissioner of Social Security,<br><br>    Defendant. | Civil Action No. 20-05308 (FLW)<br><br><br>**OPINION** |

**WOLFSON, Chief Judge:**

Wanda Rivera ("Plaintiff") appeals from the final decision of the Commissioner of Social Security, Andrew Saul ("Defendant"), denying Plaintiff disability benefits under Titles II of the Social Security Act (the "Act").  After reviewing the Administrative Record ("A.R."), the Court finds that the Administrative Law Judge's ("ALJ") decision was based on substantial evidence, and accordingly, the ALJ's decision is **AFFIRMED**.

**I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

Plaintiff, born on August 1, 1962, was 54 years old on December 31, 2016, her date last insured, qualifying her as an individual closely approaching advanced age as defined in the Code of Federal Regulations.  (A.R. 35; *see* 20 C.F.R. §§ 404.1563(d), 416.963(d)).  Plaintiff has at least a high school education, and has previously worked as a customer service representative, data entry clerk, and pre-school teacher.  (*Id.*)

On September 20, 2016, Plaintiff filed an application for a period of disability and disability insurance benefits under Title II of the Social Security Act, alleging disability as of

February 18, 2016, due to high blood pressure, hypothyroidism, depression, anxiety, numbing of the hands/fingers, carpal tunnel syndrome, arthritis, lower back pain, sleep apnea, insomnia, heart valve leakage, chest pain, and fibromyalgia.  (A.R. 25, 80-81, 92.)  Plaintiff's application was denied initially, and on reconsideration.  (A.R. 135-42.)  Plaintiff then requested a hearing with an ALJ, which was held on December 18, 2018.  (A.R. 42-79, 143-44.)  On January 15, 2019, the ALJ found Plaintiff was not disabled under the relevant statutes.  (A.R. 25-36.)  Plaintiff requested review of the ALJ's decision by the Appeals Council, which was granted on January 9, 2020.  (A.R. 217-20.)  On March 1, 2020, the Appeals Council adopted the substance of the ALJ's factual and legal findings,[1] and concluded that Plaintiff was not entitled to disability under applicable statutes.  (A.R. 1-10.)

## A.  Review of Medical Evidence

### i.    Carpal Tunnel

In 2012, Plaintiff underwent left carpal tunnel release surgery for moderately severe carpal tunnel.  (A.R. 383, 472-73.)  In September 2014, Plaintiff visited Michael T. Lu, M.D., and complained about right hand numbness and pain that had been ongoing for two to three years.  (A.R. 383.)  At the visit, Plaintiff explained that she previously had similar symptoms in her left hand, but the left-hand pain had improved after carpal tunnel release.  (*Id*.)  Dr. Lu found that palpation of the right wrist revealed tenderness, but otherwise Plaintiff had a normal range of wrist motion, 5/5 wrist strength in all muscle groups, normal sensation and reflexes, and no deformity or other swelling.  (A.R. 384.)  Further, x-rays revealed no evidence of fracture, bone lesions, or

---

[1] The Appeals Council found and corrected one typographical error in the ALJ's decision.  (A.R. 7-8.)

other abnormalities.  (*Id.*)  That day, Dr. Lu gave Plaintiff a steroid injection and fitted her with a wrist splint.  (*Id.*)

On January 19, 2015, Plaintiff visited Dr. Lu again and complained that although the injection provided her with 1-2 months of symptomatic relief, she now had right hand pain, numbness, and tingling that was keeping her awake at night.  (A.R. 327.)  Dr. Lu referred Plaintiff for an NCV/EMG, (A.R. 371), which showed moderate to severe right carpal tunnel syndrome, and mild to moderate left carpal tunnel syndrome.  (A.R. 350.)  Plaintiff returned to Dr. Lu on June 29, 2015, and Dr. Lu found that non-operative measures had not provided lasting relief, and therefore recommended right carpal tunnel release surgery.  (A.R. 323-326.)  Plaintiff underwent such surgery on July 23, 2015. (A.R. 331-34.)  Two months after surgery, Plaintiff reported that her pain and neurologic symptoms were improving.  (A.R. 315.)  Dr. Lu told Plaintiff to return if symptoms worsened or failed to improve.  (*Id.*)  The record does not indicate that she returned to Dr. Lu.

### ii.    Physical Pain

Over the years, Plaintiff was examined for various physical impairments.  At a thyroid evaluation on June 2, 2015, Plaintiff complained of bone achiness, and stated she had a history of arthritis.  (A.R. 309.)  But, the evaluation found that Plaintiff was in good health and negative for arthritis, body aches, tingling, and numbness.  (A.R. 307.)  At a neurology appointment on August 29, 2015, Plaintiff denied fibromyalgia, bone pain, or foot inflammation.  (A.R. 462.)  Upon examination, Plaintiff had a normal gait, 5/5 strength in the upper and lower extremities, no truncal ataxia, normal muscle tone, and full range of motion and no tenderness in the neck.  (A.R. 463.)  At December 2015 and January 2016 neurology appointments, Plaintiff had a normal gait and deep

tendon reflexes, good muscle strength and tone, she denied bone pain, and had no focal motor, sensory, or neurologic deficits.  (A.R. 465-68.)

On September 21, 2016, Plaintiff visited Dr. Lucyamma Thalody, M.D., with complaints of fatigue, depression, and blood pressure issues.  (A.R. 561.)  At the appointment, Plaintiff reported no localized weakness, tingling, numbness, or gait disturbance; Plaintiff's neurological exam showed no focal deficits on her motor or sensory exam, and Dr. Thalody found no muscle wasting.  (A.R. 562-63.)  Dr. Thalody advised Plaintiff to have a urinalysis, administered a B12 shot, and told her to return in four weeks.  (A.R. 563.)  In October 2016, Plaintiff returned and stated she had aches and pains all over her body. (A.R. 558.)  After examination, Dr. Thalody's impression was that Plaintiff's symptoms were in line with fibromyalgia.  (A.R. 560.)  Plaintiff received another B12 shot.  (*Id*.)  In November 2016, Plaintiff saw Dr. Thalody again, complaining of aches and pains all over her body, joint pain, and arthritic pain in her fingers.  (A.R. 591.)  Dr. Thalody advised her to go to a vascular doctor due to her leg cramps and leg pain, and then administered another B12 shot.  (A.R. 593.)  Dr. Thalody also recommended another urinalysis and told Plaintiff to come back in two weeks.  (A.R. 593.)  Two weeks later, in December 2016, Plaintiff returned to Dr. Thalody and reported feeling fairly good, aside from her urinary problems.  (A.R. 588.)  Plaintiff reported no muscle pain or swelling, and had no obvious muscle wasting.  (A.R. 589-90.)

### iii.   Hypertension

Plaintiff was diagnosed with high blood pressure and hypertensive heart disease on February 17, 2016.  (A.R. 483-84.)  That day, Plaintiff was treated at Union County Cardiology Associates, P.A., for chest pressure with no associated dyspnea, but dyspnea on exertion from walking a flight of stairs or less than one block.  (A.R. 483.)  Plaintiff's blood pressure was 140/92,

and she noted that her blood pressure was not optimally controlled.  (*Id.*)  An EKG revealed a normal sinus rhythm, and Plaintiff was recommended for an echocardiogram and a stress test.  (A.R. 484.)  On March 4, 2016, Plaintiff underwent an exercise stress test according to the Bruce protocol, but the test was terminated after 6 minutes due to fatigue.  (A.R. 479.)  The test found negative exercise stress test for coronary artery ischemia, limited exercise capacity for her age, dyspnea on moderate exertion, and hypertensive response to exercise.  (A.R. 480.)  Plaintiff also had an echocardiogram that day, which found normal left ventricle systolic function, mild concentric left ventricular hypertrophy, left ventricular ejection fraction of 60%, evidence of impaired ventricular relaxation suggestive of stage 1 diastolic dysfunction.  (A.R. 481-82.)  On June 7, 2016, at a follow up appointment, Plaintiff reported doing well since adding amlodipine, her exertional dyspnea decreased, she had no orthopnea, her occasional palpitations had decreased, and her blood pressure, which was 104/70, was well controlled under the current regiment.  (A.R. 477.)  At a follow up visit on December 6, 2016, Plaintiff stated her blood pressure, which was 118/80, was well controlled, and she had no chest pain or orthopnea.  (A.R. 577-78.)

### iv.   Vision

On January 29, 2014, Plaintiff visited Omni Eye Services and complained of decreased vision and floaters in her right eye.  (A.R. 422.)  Plaintiff was diagnosed with branch retinal vein occlusion in her right eye.  (A.R. 425-26.)  Plaintiff returned to Omni on June 2, 2014, and reported that her vision had improved, but she still had a blur spot in left side of vision.  (A.R. 429.)  Omni found Plaintiff's branch retinal vascular occlusion was still active and that there was retinal hemorrhaging/exudation, as well as ischemia.  (A.R. 433.)  On June 16, 2014, Plaintiff underwent a laser photocoagulation to the right eye.  (A.R. 438.)  When she returned to Omni on September 22, 2014, Plaintiff claimed she still had floaters and blurry vision in her right eye.  (A.R. 440.)  An

examination showed that Plaintiff's retinal vascular status was stable, and there was no evidence of worsening ischemia or maculopathy.  (A.R. 444.)   Plaintiff returned two more times in 2015, and both times reported no visual or ocular complaints, no changes in vision, no new floaters, no flashes, and no eye pain.  (A.R. 446, 452.)

### v.   Headaches

On August 29, 2015, Plaintiff visited neurologist Ying Tao, M.D. at Neurological Associates, P.A., and reported that she had headaches.  (A.R. 462.)  Plaintiff returned on December 1, 2015, and told Dr. Tao she still had headaches, mostly on the right side of her head, and blurry vision.  (A.R. 465.)  Dr. Tao recommended an MRI, (A.R. 466), which Plaintiff underwent on January 8, 2015.  (A.R. 471.)  The MRI showed mild bilateral periventricular and subcortical white matter hyperintensities on T2/FLAIR, which were non-specific, but which may represent vessel ischemic change in a patient with appropriate risk factors.  (*Id*.)  The MRI was otherwise within normal limits.  (*Id*.)  Plaintiff returned to Dr. Tao on January 29, 2016, and complained of headaches, but stated they were not as bad as before, and they came and went.  (A.R. 467.)  Dr. Tao prescribed Tylenol for the headaches.  (A.R. 468.)

### vi.   Mental Impairments

Plaintiff was also treated for various mental impairments, including memory problems, anxiety, and depression.  When Plaintiff saw Dr. Tao in August 2015, she complained that she had had an impaired memory for one to two years.  (A.R. 462.)  She also noticed problems with concentration, including forgetting what food she had eaten or clothes she had worn the day before, as well as taking longer to gather ingredients to cook.  (*Id*.)  Dr. Tao found Plaintiff to be alert and oriented, with normal language, fluency, naming, repetition, and comprehension, no depression or anxiety, and normal attention span, concentration, and knowledge of current events.  (A.R. 463.)

Dr. Tao believed that Plaintiff's memory was intact, except that she had some trouble doing the "Serial Seven" test and recalled two of three items after five minutes. (*Id*.) In her December 2015 and January 2016 appointments, Plaintiff reported continued memory problems and forgetfulness. (A.R. 465-68.) At both appointments, Plaintiff displayed normal attention span, concentration, comprehension, and mood, as well as intact recent/remote memory. (*Id*.)

From January 2014 to September 2016, Plaintiff was also receiving outpatient treatment from Jesus Pena-Mejia, M.D., of Trinitas Hospital. (A.R. 488-556.) Plaintiff was diagnosed with major depressive disorder and panic and anxiety disorder. (A.R. 488, 490, 492, 494, 496, 498, 500, 502, 504, 506, 508, 510, 512, 514.) Dr. Pena-Mejia generally noted no problem with impulsive behavior, found Plaintiff to have a hopeful demeanor, good motivation levels, and no suicidal thoughts, plans, or history of attempts. (A.R. 488, 490, 492, 494, 496, 498, 500, 502.) When Plaintiff took her medication, it appeared to help her symptoms. (A.R. 526-27, 531, 533, 535, 537, 539, 541, 543, 545, 547, 549, 551.) Between 2014 and 2016, Plaintiff reported being frustrated due to severe hand, back, and arm pain, family stress, some anxiety and depression, and despite an anxious mood, Dr. Pena-Mejia found she had no psychosis, was not suicidal or homicidal, was found to be cooperative, and had intact cognition, as well as goal-directed thoughts. (A.R. 525-35.) In 2018, after her date last insured, Plaintiff sought mental health treatment at Counseling and Assessment Clinic of Worcester (A.R. 606-21.) She was discharged for non-compliance after having canceled four of her bi-weekly appointments within three months (A.R. 606.)

### B.  Review of Testimonial Evidence

#### i.   Plaintiff's Testimony

At her hearing, Plaintiff testified she was 4'10", 130 pounds, and had completed some college work.  (A.R. 47-48.)  She testified regarding her physical and mental limitations, as well as her work experience.  As to her physical limitations, Plaintiff testified that she had body aches all over, but particularly in her back and both her feet.  (A.R. 59.)  Plaintiff stated that she could only stand for 15 minutes or walk the length of one city block before her lower back began to hurt. (A.R. 69-70.)  Plaintiff also explained that, although her carpal tunnel release procedures in both hands initially provided relief, her pain had since returned, and she can no longer do certain activities, such as opening a soda can.  (A.R. 57-59.)  She also wears braces on both hands during the day and when she sleeps.  (A.R. 59.)  Plaintiff further testified that in 2016, she had a problem controlling her blood pressure, which caused a retinal hemorrhage in her right eye that required laser surgery.  (A.R. 59-61.)  Plaintiff stated that changes in her blood pressure still cause her to have floaters in her eye.  (A.R. 61-62.)  Regarding her headaches, Plaintiff stated that she previously had terrible migraines every day, which caused her to go to the emergency room at times, but they were no longer as bad.  (A.R. 62-63.)

As to her mental limitations, Plaintiff testified that she left her job as an ESL teacher because of issues focusing and concentrating.  (A.R. 51-54.)  She also confirmed that she has been diagnosed with major depression and has faced anxiety and panic attacks her entire life.  (A.R. 65-66.)  Plaintiff further testified that her mental conditions caused her to always feel anxiety, and that it caused her to consider harming herself.  (A.R. 67.)  Her anxiety also caused panic attacks and heart palpitations that made her feel overwhelmed and lasted for an hour or more.  (A.R. 67-68.)

### ii.   Vocational Expert's Testimony

The Vocational Expert, Brian Daly (the "VE"), began his testimony by classifying Plaintiff's past jobs according to the Dictionary of Occupational Titles ("DOT"). (A.R. 72.) The VE, first, classified Plaintiff's past work as a customer service representative under DOT code 239.362-014, which has a Specific Vocational Preparation ("SVP") of 3, which is a light physical demand level. (*Id.*) Next, the VE stated Plaintiff's work as a data entry clerk was classified under DOT 203.582-054 with an SVP of 4, and was a sedentary occupation. (A.R. 72-73.) The VE then classified Plaintiff's work as an ESL teacher under DOT code 099.227-030 with an SVP of 7 and is considered light physical demand level. (A.R. 73.) Finally, the VE classified Plaintiff's work as a pre-school teacher under 092.227-018 with an SVP of 7 and is a light physical demand level. (*Id.*)

The ALJ proceeded to ask the VE the following hypothetical question:

I'd like to assume light work as it's defined in the regulations with these additional limitations. The individual would be able to occasionally climb ramps and stamps, but could never climb ladders, ropes, or scaffolds. They would be able to occasionally stoop but could never crouch or crawl. They would be able to occasionally stoop but never crouch or crawl. They would be able to frequently perform handling, fingering and feeling with the bilateral upper extremities. Occasionally push/pull with bilateral upper extremities. Occasionally reach overhead with the bilateral upper extremities. Frequently reach in all other directions with the bilateral upper extremities. They would be able to occasionally push/pull with the bilateral lower extremities as well as occasionally operate foot controls with the bilateral lower extremities. They would be able to perform work where depth [perception] were not essential to the job. They must avoid unprotected heights and moving mechanical parts. They would be able to understand, remember, and carry out simple instructions. They would be able to perform work that was not at high production pace. They would be able to adapt to routine changes in the workplace that were occasional and that were gradually introduced. Due to lapses in concentration, focus, and memory, and/or the need to change positions, the individual would be off task five percent of the day. And due to their impairments, they'd also be absent one time per month. Given this hypothetical, Mr. Daly, could the individual perform the claimant's past work as you described it?

(A.R. 73-74).  The VE responded that Plaintiff could not do the work as described.  (A.R. 74.)  The ALJ then asked if there were other jobs in the national economy available to Plaintiff given this hypothetical.  (A.R. 74.)  The VE responded yes, and that Plaintiff could perform the work of an usher, an information clerk, and a chaperone.  (A.R. 74-75.)

The ALJ then asked the VE if Plaintiff would be able to perform other work in the national economy if she added to the hypothetical that the individual would be limited to only occasionally performing handling, fingering, and feeling with the bilateral extremities.  (A.R. 75.)  The VE responded that such a hypothetical would reduce the job base overall, and there would not be any occupations an individual could perform.  (*Id*.)  The ALJ then added to the first hypothetical again, asking if Plaintiff's impairments caused her to be absent two times per month, would there be work that still exists for her in the national economy.  (*Id*.)  The VE replied no, it would preclude employment in the national, local, or regional economy.  (A.R. 75-76.)

### C.  The ALJ and Appeals Council Decisions

On January 15, 2019, the ALJ issued a written decision analyzing whether Plaintiff satisfied her burden on demonstrating disability using the standard five-step process.  (A.R. 25-36.)  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity during the period of her alleged onset date of February 18, 2016, through her date of last insured of December 31, 2016.  (A.R. 27.)  At step two, the ALJ determined that Plaintiff had the following severe impairments: anxiety, depression, bilateral carpal tunnel syndrome, arthritis of the bilateral feet, obesity, herniated disc, fibromyalgia, migraine headaches, and status post branch retinal vein occlusion with vitreous hemorrhage.  (*Id*.)

At step three, the ALJ found that "the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments" in the

relevant CFR section. (A.R. 29.) In reaching this decision, the ALJ considered opinions from Disability Determination Services (DDS) medical consultants who evaluated Plaintiff's application. (*Id*.) Further, the ALJ found that Plaintiff's mental impairments, considered singly or in combination, did not meet the criteria of listings 12.04 and 12.06. (*Id*.) In making this decision, the ALJ considered the "paragraph B" criteria, which are satisfied when the mental impairments result in at least one extreme or two limitations in a broad area of functioning. (A.R. 29-30.) In understanding, remembering, or applying information, the ALJ found Plaintiff had a moderate limitation. (A.R. 30.) In interacting with others, Plaintiff had no limitation. (*Id*.) The ALJ also found Plaintiff had moderate limitations in concentrating, persisting, or maintaining pace, as well as adapting or managing oneself. (*Id*.) The ALJ also noted that Plaintiff's record was limited concerning formal mental health testing and evaluations, and she did not have a history of mental health concerns.[2] (*Id*.) Given these limitations, when viewed in the light most favorable to the claimant, the ALJ determined that the claimant did not have at least two marked limitations or one extreme limitation, and therefore, the "paragraph B" criteria were not met. (*Id*.)

At step 4, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined by the relevant CFR. (A.R. 31.) In making this finding, the ALJ "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," based on the relevant CFR. (*Id*.) The ALJ also considered four DDS opinions. (A.R. 34.) The first opinion, by Jane Sapiro and Nancy Simpkins, found that there was insufficient evidence to support a finding of a severe mental condition. (*Id*.) The opinion noted that Plaintiff "failed to cooperate" because, despite

---

[2] The ALJ remarked that Plaintiff sought mental health treatment, but it was terminated due to Plaintiff canceling appointments.

multiple requests, Plaintiff did not provide Sapiro and Simpkins with daily living questionnaires. (*Id*.)  The ALJ gave "little weight" to this opinion, noting that the Sapiro and Simpkins did not have the opportunity to directly examine Plaintiff or ability to review more updated records.  (*Id*.) The second opinion, by Dr. Esther Tomor, determined that Plaintiff did not have a severe impairment.  (*Id*.)  Dr. Tomor also was unable to review more updated records, and therefore, the ALJ gave "little weight" to the assessment.  (*Id*.)  The third opinion, provided by Dr. Algernon Phillips, determined, after examining the record, that Plaintiff's visual issues were nonsevere.  (*Id*.) Specifically, Dr. Phillips found that Plaintiff's near and far acuity, as well as her depth perception, color vision, and field of vision, were limited in Plaintiff's right eye.  (*Id*.)  Plaintiff also had limited accommodation bilaterally.  (*Id*.)  In addition, Dr. Phillips stated that Plaintiff could work without concentrated exposure to hazards.  (*Id*.)  The ALJ accorded this opinion "partial weight" because Dr. Phillips did not have the opportunity to directly examine Plaintiff.  (*Id*.)   Finally, Dr. John Thibodeau examined Plaintiff's mental impairments, and determined that Plaintiff had mild restrictions in understanding, interaction, concentration, and adaptation.[3]  (*Id*.)  Although Dr. Thibodeau did not have the opportunity to directly examine Plaintiff, Dr. Thibodeau was able to review Plaintiff's medical history at the time of the opinion, and therefore, his opinion was given "partial weight."  (*Id*.)

Further, the ALJ found that through the date of last insured, Plaintiff was unable to perform any past relevant work.  (A.R. 35.)  Finally, at step 5, the ALJ determined that there were jobs that existed in significant numbers in the national economy that the claimant could have performed.

---

[3] The ALJ attributes the fourth opinion to Dr. Thibodeau, but credits "Dr. Tomor" with the evaluation in the remainder of the relevant passage.  (A.R. 34.)  The administrative record confirms that the ALJ referred to Dr. Tomor in error, and the evaluation was, indeed, conducted by Dr. Thibodeau.  (A.R. 100.)

(*Id*.)  Therefore, the ALJ concluded that Plaintiff did not have a disability as defined by the Social Security Act.  (A.R. 36.)

Plaintiff requested the Appeals Council to review the ALJ's decision, which the Appeals Court granted.  (A.R. 7.)  On March 1, 2020, the Appeals Council adopted the ALJ's findings or conclusions regarding whether the claimant is disabled, and found that Plaintiff was not entitled to disability insurance.  (A.R. 7-10.)

## II.   <u>STANDARD OF REVIEW</u>

On a review of a final decision of the Commissioner of the Social Security Administration, a district court "shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g); *see Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001).  The Commissioner's decisions regarding questions of fact are deemed conclusive on a reviewing court if supported by "substantial evidence in the record."  42 U.S.C. § 405(g); *see Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  While the court must examine the record in its entirety for purposes of determining whether the Commissioner's findings are supported by substantial evidence, *Gober v. Matthews*, 574 F.2d 772, 776 (3d Cir. 1978), the standard is highly deferential.  *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).  Indeed, "substantial evidence" is defined as "more than a mere scintilla," but less than a preponderance. *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004).  "It means such relevant evidence as a reasonable mind might accept as adequate."  *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999).  A reviewing court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder."  *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992), *cert. denied*, 507 U.S. 924 (1993).  Accordingly, even if there is contrary evidence in the record

13

that would justify the opposite conclusion, the Commissioner's decision will be upheld if it is supported by the evidence. *See Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986).

Disability insurance benefits may not be paid under the Act unless Plaintiff first meets the statutory insured status requirements. *See* 42 U.S.C. § 423(c). Plaintiff must also demonstrate the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months...." 42 U.S.C. § 423(d)(1)(A); *see Plummer*, 186 F.3d at 427. An individual is not disabled unless "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" 42 U.S.C. § 423(d)(2)(A). Eligibility for supplemental security income requires the same showing of disability. *Id*. at § 1382c (a)(3)(A)-(B).

The Act establishes a five-step sequential process for evaluation by the ALJ to determine whether an individual is disabled. *See* 20 C.F.R. § 404.1520. First, the ALJ determines whether the claimant has shown that he or she is not currently engaged in "substantial gainful activity." *Id*. at § 404.1520(a); *see Bowen v. Yuckert*, 482 U.S. 137, 146-47 n.5 (1987). If a claimant is presently engaged in any form of substantial gainful activity, he or she is automatically denied disability benefits. *See* 20 C.F.R. § 404.1520(b); *see also Bowen*, 482 U.S. at 140. Second, the ALJ determines whether the claimant has demonstrated a "severe impairment" or "combination of impairments" that significantly limits his physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c); *see Bowen*, 482 U.S. at 146-47 n.5. Basic work activities are defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1522(b). These activities

include physical functions such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling." *Id*. A claimant who does not have a severe impairment is not considered disabled. *Id*. at § 404.1520(c); *see Plummer*, 186 F.3d at 428.

Third, if the impairment is found to be severe, the ALJ then determines whether the impairment meets or is equal to the impairments listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1 (the "Impairment List"). 20 C.F.R. § 404.1520(a)(4)(iii). If the claimant demonstrates that his or her impairments are equal in severity to, or meet those on the Impairment List, the claimant has satisfied his or her burden of proof and is automatically entitled to benefits. *See id*. at § 404.1520(d); *see also Bowen*, 482 U.S. at 146-47 n.5. If the specific impairment is not listed, the ALJ will consider in his or her decision the impairment that most closely satisfies those listed for purposes of deciding whether the impairment is medically equivalent. *See* 20 C.F.R. § 404.1526(a). If there is more than one impairment, the ALJ then must consider whether the combination of impairments is equal to any listed impairment. *Id*. An impairment or combination of impairments is basically equivalent to a listed impairment if there are medical findings equal in severity to all the criteria for the one most similar. *Williams*, 970 F.2d at 1186.

If the claimant is not conclusively disabled under the criteria set forth in the Impairment List, step three is not satisfied, and the claimant must prove at step four whether he or she retains the RFC to perform his or her past relevant work. 20 C.F.R. § 404.1520(e); *Bowen*, 482 U.S. at 141. If the claimant can perform past relevant work, the claimant is determined to not be disabled. 20 C.F.R. §§ 404.1520(e), 416.920(e); *Bowen*, 482 U.S. at 141-42. The claimant bears the burden of demonstrating an inability to return to the past relevant work. *Plummer*, 186 F.3d at 428. Finally, if it is determined that the claimant is no longer able to perform his or her past relevant work, the burden of production then shifts to the Commissioner to show, at step five, that the

15

"claimant is able to perform work available in the national economy." *Bowen*, 482 U.S. at 146-47 n.5; *Plummer*, 186 F.3d at 428.  This step requires the ALJ to consider the claimant's RFC, age, education, and past work experience.  20 C.F.R. § 404.1520(f).  The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether the claimant can perform work and not disabled.  *Id.*

## III.   PLAINTIFF'S CLAIMS ON APPEAL

Plaintiff maintains that the administrative record contains substantial evidence of entitlement and eligibility for benefits, and therefore, requests that this Court reverse the Commissioner's final administrative decision. (Pl. Br. 10.)  Alternatively, Plaintiff claims that the Commissioner's final administrative decision is not based on substantial evidence, and thus, requests this Court to remand the decision and order a new hearing and decision.  (*Id.*)

In support, Plaintiff first argues that the ALJ erred at step two by failing to find that Plaintiff's hypertension and hypertensive heart disease were severe impairments.  (Pl. Br. 11-16.) Next, Plaintiff contends that the ALJ presented an insufficient rationale when finding that Plaintiff's impairments, alone or in combination, do not meet or equal a listed impairment at step 3.  (Pl. Br. 16-29.)  Lastly, Plaintiff argues that the ALJ's decisional RFC was not based on substantial evidence and failed to provide the required comprehensive analysis.  (Pl. Br. 29-44.)

### A.   Substantial Evidence Supports the ALJ's Evaluation of Plaintiff's Hypertension and Hypertensive Heart Disease

Plaintiff disputes the ALJ's decision not to characterize Plaintiff's hypertension and hypertensive heart disease as "severe."  (Pl. Br. 13-16.)  Specifically, Plaintiff states the results of her stress test, discussed *supra*, "most certainly demonstrate a severe impairment, hypertensive heart disease, which 'more than minimally affects' her ability to sustain work activity."  (Pl. Br. 15.)

At step two, the ALJ determines whether the claimant has demonstrated a "severe impairment" or "combination of impairments" that significantly limits her physical or mental ability to do basic work activities.  20 C.F.R. § 404.1520(c); *see Bowen*, 482 U.S. at 146-47 n.5. To be a severe impairment, the issue must "significantly limit the claimant's physical or mental ability to do basic work activities."  20 C.F.R. § 404.1522(a).

Here, the ALJ decision regarding Plaintiff's hypertensive heart disease was supported by substantial evidence.  First, the ALJ detailed Plaintiff's exercise stress test results from March 4, 2016, describing Plaintiff's resting and maximum heart rate and blood pressure, and stating that the test was terminated due to fatigue.  (A.R. 29.)  Further, the ALJ considered the results of the stress test, which revealed that Plaintiff was negative for coronary artery ischemia, she had limited exercise capacity for her age, dyspnea on moderate exertion, and hypertensive response to exercise.  (*Id.*)  The ALJ also considered Plaintiff's echocardiogram, which indicated that she had normal left ventricle systolic function, left ventricular fraction of 60%, stage 1 diastolic dysfunction, and mild concentric left ventricular hypertrophy.  (*Id.*)  Additionally, the ALJ noted that when using Benicar, Plaintiff's blood pressure was perfectly under control, but she was forced to switch from the medication due to insurance issues.  (*Id.*)  But, eventually, Plaintiff's provider put in an authorization for Benicar.  (*Id.*)  An ECG during the relevant period was also normal. (*Id.*)  For all of these reasons, the ALJ found that "[w]hile the record indicated that the claimant had symptoms of the conditions, the objective medical evidence does not support a finding that the claimant's high blood pressure and hypertensive heart disease more than minimally affects the claimant's ability to perform basic work activities and are nonsevere."  (*Id.*)

Notably, Plaintiff does not argue that the ALJ failed to analyze the results of the stress test. (*See* Pl. Br. 15.)  Rather, Plaintiff posits that the ALJ's findings in this context constitute "error,

17

and not a 'harmless' one." (Pl. Br. 16.) In other words, Plaintiff disagrees with the ALJ's assessments. But this Court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams*, 970 F.2d at 1182. I must determine whether the ALJ made her decision based on substantial evidence. *See McCrea*, 370 F.3d at 360 ("Although substantial evidence is more than a mere scintilla, it need not rise to the level of a preponderance."). Here, the ALJ clearly considered the various tests and examination results described *supra*, including that Plaintiff's blood pressure was "perfectly" under control with Benicar, and found, based on those results, that her hypertensive heart disease only "minimally" affected her abilities to perform basic work activities. (A.R. 29.) Therefore, I find that the ALJ made that decision based on substantial evidence.

**B. Substantial Evidence Supports the ALJ's Finding that Plaintiff's Impairments Did Not Meet a Listing at Step 3**

Plaintiff submits that the ALJ's opinion, as required by Third Circuit precedent and Social Security Ruling 17-2p, failed to expressly analyze Plaintiff's severe impairments and determine whether those impairments, singly or in combination, meet a disability listing. (Pl. Br. 16-18.) Specifically, Plaintiff maintains that the ALJ failed to specifically identify any listing, element of a listing, or the evidence considered while analyzing whether Plaintiff's impairments, combined, could meet these listings. (Pl. Br. 22-25.) Regarding Plaintiff's two psychiatric impairments, Plaintiff argues that the ALJ failed to properly analyze the "paragraph B" criteria because the ALJ did not consider the psychiatric evidence, determine the proper limitation on each of four areas of mental functioning, or set forth record evidence considered to reach such a conclusion.

**i. The ALJ's decision met the step three analytical requirements.**

In *Burnett v. Social Security Administration*, the Third Circuit held that, at step three, the ALJ is "require[d] to set forth the reasons for [her] decisions[,]" and that it was insufficient to

merely provide "conclusory statements" that an impairment did not meet certain listings.  220 F.3d

112, 119-20 (3d Cir. 2000).[4]  Subsequent to *Burnett*, in *Jones v. Barnhart*, the Third Circuit

explained that, although conclusory statements are insufficient, "*Burnett* does not require the ALJ

to use particular language or adhere to a particular format in conducting [her] analysis." 364 F.3d

at 504-05.  Rather, the *Jones* court stated that the underlying purpose of *Burnett* was to ensure

"that there is sufficient development of the record and explanation of findings to permit meaningful

review." *Id*. at 505.  Thus, in *Jones*, the court determined that although the ALJ did not identify

or analyze the most relevant listing, the ALJ had satisfied the *Burnett* standard by evaluating the

available medical evidence in the record and setting forth the evaluation in the opinion.  *Id*.[5]

Here, like in *Jones*, although the ALJ did not state what specific listings she analyzed, the

ALJ sufficiently evaluated the medical record to permit meaningful judicial review.  At step three,

the ALJ found:

> The claimant has no impairment, which meets the criteria of any of the listed
> impairments described in Appendix 1 of the Regulations (20 C.F.R., Part 404,
> Subpart P, Appendix 1). No treating or examining physician has mentioned
> findings equivalent in severity to the criteria of any listed impairment. The
> Administrative Law Judge has reviewed all of the evidence and concludes that the
> claimant's impairments, both singly and in combination, do not meet or equal the
> severity of any listing. In reaching this conclusion, the undersigned has also
> considered the opinion of the Disability Determination Services (DDS) medical
> consultants who evaluated the issue at the initial and reconsideration levels of the
> administrative review process and reached the same conclusion (20 C.F.R.
> 404.1527(f) and Social Security Ruling 17-2p).

---

[4] In *Burnett*, the ALJ's step three analysis stated: "Although [Burnett] has established that she
suffers from a severe musculoskeletal [impairment], said impairment failed to equal the level of
severity of any disabling condition contained in Appendix 1, Subpart P of Social Security
Regulations No. 4." *Id*. at 119.

[5] In *Jones*, the ALJ's step three analysis concluded: "[A]fter 'carefully compar[ing] the claimant's
signs, symptoms, and laboratory findings with the criteria specified in all of the Listings of
Impairments,' 'the claimant's impairments do not meet or equal the criteria established for an
impairment shown in the Listings.'" *Id*. at 503.

(A.R. 29.)   Here, the ALJ listed the sources she considered in determining that Plaintiff's impairments did not meet a listing, including findings of treating or examining physicians, the entirety of the available evidence, and the opinion of the DDS medical consultants.   (A.R. 29.) The ALJ further detailed Plaintiff's severe and non-severe impairments, and reviewed the record on Plaintiff's obesity, (A.R. 27), fibromyalgia, (A.R. 28), eczema, (*Id.*), hypothyroidism, (A.R. 28-29), high blood pressure and hypertensive heart disease, (A.R. 29), sleep apnea, (*Id.*), vision, (A.R. 32), carpal tunnel, (*Id.*), depression, (*Id.*), anxiety (A.R. 32-33), headaches (A.R 33), and body aches. (*Id.*)   The ALJ also noted the inconsistencies between the medical record and Plaintiff's own complaints, including the limited nature, or lack, of testing indicating any purported restricted movement, mental status, or functioning.   (*Id.*)   In addition, the ALJ described the DDS's findings, and explained how each opinion was weighed.   (A.R. 34.)   Finally, the ALJ stated that she reviewed the medical evidence and concluded that, both singly and in combination, Plaintiff's impairments did not meet any listing.   (A.R. 29.)

Therefore, in light of the ALJ's determination, I find that the reasons for the ALJ's decision regarding listings are properly set forth throughout her decision in a manner permitting meaningful judicial review, and based on that review, I find the ALJ did not err in this respect.

### ii.   Substantial evidence supports the ALJ's "paragraph B" evaluation.

The ALJ's step three analysis of Plaintiff's mental impairments was also supported by substantial evidence.   The ALJ found that Plaintiff's "mental impairments, singly and in combination did not meet or medically equal the criteria of listings 12.04 and 12.06." (A.R. 29.) As the ALJ explains:

> In making this finding, the undersigned has considered whether the "paragraph B" criteria were satisfied. To satisfy the "paragraph B" criteria, the mental impairments must result in at least one extreme or two marked limitations in a broad area of functioning, which are: understanding, remembering, or applying information;

> interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing themselves. A marked limitation means functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited. An extreme limitation is the inability to function independently, appropriately or effectively, and on a sustained basis.

(A.R. 30.)  The ALJ goes on to find that Plaintiff had moderate limitations in (1) understanding, remembering, or applying information; (2) concentrating, persisting, or maintaining pace; and (3) adapting or management oneself.  (*Id*.)  The ALJ also determined that Plaintiff had no limitation in interacting with others.  (*Id*.)  In making these findings, the ALJ noted that Plaintiff's mental health record was limited in terms of formal testing and evaluation.  (*Id*.)  Further, Plaintiff did not have a history of mental health hospitalization.  (*Id*.)  And while Plaintiff did seek mental health treatment, it was terminated because Plaintiff canceled appointments.  (*Id*.)  The ALJ does note that Plaintiff complained of memory and concentration issues, as well as panic and anxiety, but that her conditions showed improvement with medication.  (*Id*.)

The ALJ further described the medical evidence regarding memory and concentration issues, depression, panic, and anxiety. (A.R. 32-33.)  This includes a detailed account of Plaintiff's long-term and short-term memory testing results, which revealed Plaintiff had difficulty on the "Serial Sevens test," could only recall two of three items after five minutes, intact recent and remote memory, and normal attention span and concentration.  (A.R. 32.)  The ALJ also considered Plaintiff's mental health treatment at Trinitas Hospital and the Counseling and Assessment Clinic of Worcester.  (*Id*.)  Trinitas Hospital, where Plaintiff was treated for a major depressive disorder, indicated that Plaintiff was generally compliant with medication, which appeared to help with her symptoms.  (*Id*.)  While Worcester clinic noted that Plaintiff met the criteria for a major depressive disorder and generalized anxiety disorder, her prognosis was good.  (*Id*.)  Further, Plaintiff was discharged from the clinic after canceling four bi-weekly appointments within three months.  (*Id*.)

Examining the record on the whole, the ALJ's paragraph B evaluation is based on substantial evidence.

### C. Substantial Evidence Supports the ALJ's RFC Finding

Plaintiff argues that the ALJ failed to provide substantial evidence of her decision on Plaintiff's RFC. (Pl. Br. 29-39.) Specifically, Plaintiff claims that the ALJ's reasoning on RFC ran afoul of the Third Circuit's decisions in *Cotter v. Harris* and *Burnett*, which held that the "ALJ must explain which evidence contradicts [her] finding and which evidence supports [her] finding and why one set of medical data is found more persuasive than the other." (Pl. Br. 30); *see Cotter v. Harris*, 650 F.2d 481 (3d Cir. 1981); *Burnett*, 220 F.3d 112. Plaintiff also maintains that the ALJ's RFC decision is based solely on the ALJ's unexplained lay impressions, that the opinion does not rely on a doctor, and it gives little weight to the DDS reviewers. (A.R. 31-38.)

"[RFC] is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Burnett*, 220 F.3d at 121 (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n.1 (3d Cir. 1999)); *see* 20 C.F.R. § 404.1545(a). When a case is brought to an administrative hearing, the ALJ is charged with ultimately determining the claimant's RFC. 20 C.F.R. §§ 404.1527(e), 404.1546(c), 416.927(e), 416.946(c). "[I]n making a residual functional capacity determination, the ALJ must consider all evidence before him," and, although the ALJ may weigh the credibility of the evidence, she must "give some indication of the evidence which [s]he rejects and [her] reason(s) for discounting such evidence." *Burnett*, 220 F.3d at 121; *see Cotter*, 642 F.2d 704. When assessing a claimant's RFC, an ALJ must consider all of the claimant's medically determinable impairments which are supported by the record, including those considered non-severe. 20 C.F.R. §§ 404.1545 (a)(2), 416.945 (a)(2); *see also Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005). "Where the ALJ's findings of fact are supported by

substantial evidence, [district courts] are bound by those findings, even if [the courts] would have decided the factual inquiry differently." *Hagans v. Comm'r of Soc. Sec.*, 694 F.3d 287, 292 (3d Cir. 2012) (internal quotation marks and citation omitted).

> i.   **The ALJ sufficiently analyzed the record.**

As an initial matter, Plaintiff overstates the obligations *Cotter* places on ALJ's. While *Cotter* does require an ALJ to "indicate" that she "considered all the evidence, both for and against the claim, and provide some explanation of why s/he has rejected probative evidence" supporting a contrary finding, "the ALJ is *not* required to supply a comprehensive explanation for the rejection of evidence; in most cases, a sentence or short paragraph would probably suffice." *Cotter*, 650 F.2d at 482 (emphasis added). Moreover, the purpose of *Cotter* is to "facilitate meaningful judicial review." *Hernandez v. Comm'r of Social Sec.*, 89 Fed. Appx. 771, 773 (3d Cir. 2004) (internal quotations omitted). Therefore, so long as the reviewing court "can determine that there is substantial evidence supporting the Commissioner's decision[,] . . . the *Cotter* doctrine is not implicated." *Id*. at 774. Here, the Court finds that the Commissioner's RFC decision is supported by substantial evidence.

After considering the record, the ALJ found that:

[Plaintiff] had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she is able to occasionally climb ramps and stairs. She can never climb ladders ropes scaffolds. The claimant is able to occasionally stoop. She can never crouch or crawl. She is able to frequently perform handling fingering feeling with the bilateral upper extremities. She can occasionally push pull with bilateral upper extremities. She can occasionally reach overhead with bilateral upper extremities. She is able to frequently reach in all other directions with bilateral upper extremities. She can occasionally push pull with the bilateral lower extremities. She is able to occasionally operate foot controls with bilateral lower extremities. She is able to perform work where depth perception is not essential to the job. She must avoid unprotected heights and moving mechanical parts. She is able to understand remember and carry out simple instructions. She is able to perform work that is not at high production pace. She can adapt to routine changes in workplace that are occasional and that are gradually introduced. Due to lapses in

concentration, focus and memory and/or need to change positions the claimant would be off task 5% of the day. Due to impairments the claimant would be absent once per day.

(A.R. 31.)  In making this finding, ALJ "indicated" that she "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence . . . based on the requirements of 20 CFR § 404.1529 and SSR 16-3p."  (A.R. 31; *see Cotter*, 650 F.2d at 482.)  The ALJ also "considered opinion evidence in accordance with the requirements of 20 CFR § 404.1527."  (*Id*.)  As described, *supra*, the ALJ detailed the relevant medical evidence considered for each impairment.

Additionally, the ALJ explained why Plaintiff had not established greater RFC limitations. In the ALJ's view, the "medical record demonstrated inconsistencies with claimant's allegations." (A.R. 33.)  The ALJ noted that "the record was limited concerning conditions that imposed further limitations than those described above."  (*Id*.)  And although Plaintiff did seek treatment, the overall record contained "limited objective testing" that showed "restricted movement, mental status, or functioning."  (*Id*.)  The ALJ stated that while "the record did support limitations, the objective testing available did not support restrictions further than those noted above."  (*Id*.) Regarding Plaintiff's mental health conditions, the ALJ noted that Plaintiff "appeared to do well with treatment" and indicated "positive responses to medication[,]" but "she did not appear to maintain compliance with treatment" and had "canceled multiple counseling sessions."  (*Id*.)  In relation to carpal tunnel, the ALJ found that Plaintiff's complaints regarding her bilateral grip, but ability to use buttons and zippers were inconsistent. (*Id*.)  In sum, the ALJ determined that, although Plaintiff's impairments could reasonably be expected to cause the alleged symptoms, here "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence" and other evidence in the record.  (A.R. 33-34.)

In combination, these statements are beyond the "sentence or paragraph" required and are sufficient to substantially support the ALJ's RFC decisions.

Plaintiff also disagrees with the ALJ's specific characterizations of Plaintiff's functional capabilities, including her ability to stand for long periods, frequently perform bilateral upper extremity activity, and how often Plaintiff would be absent from work, among others. (A.R. 33-38.) But, again, these are disagreements with the ALJ's particular findings, not the existence of substantial evidence on the record to support the ALJ's decision. Notably, the district court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams*, 970 F.2d at 1182. As noted *supra*, "[w]here the ALJ's findings of fact are supported by substantial evidence, [district courts] are bound by those findings, even if [the courts] would have decided the factual inquiry differently." *Hagans*, 694 F.3d at 292. In light of my deferential role in reviewing the ALJ's decision, I find the ALJ has supported her conclusions by relying on substantial evidence for the RFC determinations.

### ii.   The ALJ appropriately considered the relevant medical evidence and the opinion is not based on unexplained lay impressions.

Finally, Plaintiff argues that the ALJ employed her own medical expertise over the medical professionals who treated Plaintiff and examined her medical record. (Pl. Br. 31-33.) According to Plaintiff, the RFC is "based solely on the ALJ's unexplained lay impressions. The opinion of no doctor is relied upon, not even DDS-file reviewers who get either 'little weight' or the always confoundingly vague 'partial weight[.]'" (Pl. Br. 33.)

The relevant regulations state that the ALJ "is responsible for assessing [] residual functional capacity." 20 C.F.R. § 404.1546(c). This means that the "ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations." *Chandler v. Comm'r of Social Sec.*, 667 F.3d 356, 361 (3d Cir. 2011).

As an initial matter, Plaintiff accuses the ALJ of employing her own medical expertise and ignoring credible medical opinions, but at no point does Plaintiff explain what competent medical evidence in the record the ALJ ignored in making her decision. *See Yensick v. Barnhart*, 245 F. App'x 176, 181 (3d Cir. 2007) ("Further, an ALJ 'is not free to employ [his] own expertise against that of a physician who presents competent medical evidence.'" (internal citations omitted))

Moreover, I disagree with Plaintiff's characterization of the ALJ's RFC finding. It is implausible to argue that the ALJ did not rely on the opinion of a doctor. Most of the opinion, which sets forth the evidence considered by the ALJ, cites to Plaintiff's medical record, including treatment notes by her treating physicians. The record also reflects the opinions of DDS-file reviewers, which included multiple doctors. (A.R. 34.) In addition, "[i]n making a residual functional capacity determination, the ALJ must consider all evidence before [her]." *Burnett*, 220 F.3d at 121. And here, that occurred, as the ALJ stated that the RFC was "supported by the record as a whole, which indicated the claimant's conditions would impose restrictions, yet not to the degree alleged by the claimant." (A.R. 34.) Examining all available medical evidence and opinions and making a decision based on that evidence is not a "lay impression," but the very essence of what the Social Security Act and its regulations require. *See* 20 C.F.R. § 404.1546(c).

Additionally, Plaintiff questions the weight the ALJ gave to DDS-file reviewers. As an initial matter, none of the DDS reviewers found that Plaintiff had any severe impairments. In that regard, Plaintiff cannot point to any of the DDS opinions that can support her disability status. (*See* A.R. 34.) In any event, regarding weight, the ALJ did, in fact, provide specific reasons for the weight accorded to each reviewer. For example, the DDS opinion of Algernon Phillips, M.D., was given partial weight. (*Id.*) Although Dr. Phillips did not have the opportunity to directly examine Plaintiff, Dr. Phillips reviewed the record, and based on that review opined that Plaintiff's

visual issues were non-severe.  (*Id*.)  Dr. Phillips found that Plaintiff had limited near and far acuity and field of vision in her right eye, as well as limited accommodation bilaterally.  (*Id*.)  Additionally, Dr. Phillips stated Plaintiff could work without concentrated exposure to hazards.  (*Id*.)  The ALJ found that while Dr. Phillips's opinion was "somewhat consistent with the record concerning claimant's visual issues, the undersigned determined that [Plaintiff's] conditions would impose the restrictions noted in the [RFC] above based on a review of the record.  For these reasons, the opinion is given partial weight.  (*Id*.)   More importantly, the ALJ independently determined that Plaintiff had certain severe impairments, notwithstanding any of the DDS opinions which found no severe impairments.  In other words, the ALJ's determinations in this regard were favorable to Plaintiff.

In sum, substantial evidence supports the ALJ's RFC determination.  Plaintiff's appeal is largely another request to reweigh the evidence, which this Court cannot do under applicable standards.  Accordingly, the ALJ did not err in her RFC decision.

IV.   **CONCLUSION**

For the reasons set forth above, the Court finds that the ALJ's decision was supported by substantial evidence in the record.  Accordingly, the ALJ's decision is **AFFIRMED**. An appropriate Order shall follow.

Dated: November 4, 2021                                   /s/ Freda L. Wolfson
                                                                      Hon. Freda L. Wolfson
                                                                      U.S. Chief District Judge

27